WILLIAM A. SHEA, Plaintiff, v. PHIL T. CHINN and Another,
Defendants.*

Supreme Court, Saratoga County, December —, 1927.

Conversion — demand — action to recover value of stallion and brood
mare — original possession was with consent of plaintiff — evidence
shows demand for return — value of horses fixed.

This is an action to recover for the alleged conversion of a stallion and a brood
mare.   The evidence shows that the plaintiff turned the horses over to the
defendants for care and that under the agreement the defendants had the right
to use the stallion in their stud, to retain from the fees thus received an amount
sufficient to pay for the care of the horses and to turn over the balance to the
plaintiff.   Since the defendants came into possession of the horses lawfully
it was necessary for the plaintiff to establish that he had demanded the return
of the horses and while the defendants contend that no demand was made
for their return the evidence clearly sustains the plaintiff's contention that
a demand was made for the return of the horses not only orally, but in writing.
The witnesses for the parties fixed the value of the horses at widely different
amounts, but taking into consideration the breeding of the horses and the fact,
in reference to the stallion that certain offers had been made and refused by
the plaintiff, the value of the stallion is fixed at $25,000.   The value of the brood
mare is fixed at $3,000.
The contentions by the defendants that they were not required to respect a demand
for the return of the horses on the ground that they had a lien on them for their
care is without force, for the question was not presented by the pleadings nor
litigated on the trial, and furthermore, the earnings which the defendants received
from the stallion and the foal which came to them from the brood mare largely
exceeded the cost of care of the horses.

ACTION for the conversion of thoroughbred horses.

Ryan & Bowers [Thomas Jefferson Ryan and Lawrence B.
Mc Kelvey of counsel], for the plaintiff.

Brackett & Eddy [Spencer G. Eddy of counsel], for the defendants.

HEFFERNAN, J.   There are two causes of action stated in the
complaint.   The first involves a stallion named Tea Caddy and
a brood mare named Blue Grass Belle.   The second cause of action
concerns three yearlings.   That cause of action was unproved,
was abandoned by the plaintiff upon the trial and hence must be
dismissed without further comment.

It is undisputed that about January 15, 1926, Tea Caddy, Blue
Grass Belle and certain other horses belonging to the plaintiff
were shipped from Berryville, Va., to the breeding farm in Ken-
tucky, technically owned and controlled by the corporate defendant
Himyar Stud, but in reality the property of the defendant Phil T.
Chinn.   While the corporation, of course, has a distinct and separate

entity, concededly Mr. Chinn is its principal stockholder and its directing officer. It seems to me that it cannot be seriously doubted that if the plaintiff is entitled to recover at all then the defendants are jointly and severally liable. To state it tersely this corporation is simply the business vehicle of the defendant Chinn. One Madden, a mutual friend of the parties, made the arrangements for the delivery of plaintiff's horses to defendants. The defendants were to charge a flat rate per month for the maintenance and care of the animals and to account to the owner for any balance realized from their service in the stud. On the trial it was conceded that a separate accounting action is pending in the Supreme Court in New York county in which the respective claims of the parties are to be adjusted and the court is not concerned with the issues involved in that litigation. As I suggested on the trial, in which both parties acquiesced, there are but two issues in this case — was there a proper demand made by plaintiff for the return of these horses prior to the commencement of the action and, if so, what is their value?

Defendants came into possession of these animals lawfully. Therefore, in order to maintain this action plaintiff, in addition to showing that he is entitled to their return, must establish that he made demand therefor with which defendants failed to comply. The sole purpose of such a demand is to turn an otherwise lawful possession into an unlawful one by non-compliance with it.

Plaintiff contends that he made a written demand for the return of the horses in April, 1927, and two personal demands later in the year, one during the month of June at Belmont Park, and the other during the month of August at Saratoga Springs. He is corroborated to some extent as to the oral demands. In this situation the surrounding circumstances and the probabilities as to what occurred are highly significant. The plaintiff attached certain property said to belong to the defendants and on August 18, 1927, in connection with the vacation of that warrant the defendants appeared. While the papers in the suit were being prepared, plaintiff was advised by his counsel that a formal demand should be made and he instructed him particularly as to its form and the necessity thereof. Plaintiff has testified that he made such a demand in accordance with his attorney's advice. It is very improbable that he neglected such an important requisite. He had been fully advised that a demand was imperative and it would be strange, indeed, to believe that he omitted to comply with his counsel's direction or deceived him in that respect. Surely plaintiff must have known that his neglect to take this simple precaution would be fatal to the success of his action and would imperil the only property of which he was the owner. It is true that defendant

22

Supreme Court, December, 1927.       [Vol. 131.

Chinn makes denial. Nevertheless, I cannot escape the conviction that a demand was made and that defendants, for reasons that are not far to seek, deliberately ignored it. Then, too, the alleged failure of the plaintiff to make a proper demand is evidently an afterthought on the part of the defendants. It was quite obvious on the trial that they expected to defeat plaintiff's claim by the production of a bill of sale of Tea Caddy to a stranger to the litigation. This theory was abandoned when it became apparent that the document, although absolute on its face, was merely the evidence of a loan. I am also satisfied that the letter of defendant Chinn to Madden, dated December 3, 1926, never came to plaintiff's attention. To say the least, it is extremely doubtful if it was ever mailed. The subsequent conduct of the defendants respecting these horses is wholly inconsistent with the transmission of such a letter. Chinn now asserts that he had been grossly insulted by Shea and that while justifiably angry he dispatched this communication in which he announced his intention, in forcible terms, to be rid of Shea and all that pertained to him. His actions tell another tale. Without any reconciliation, without any intervening reason, according to his own testimony, he continued to handle the horses as he had done in previous years.

The question of value is a troublesome one. Not only is the subject unusual, but there is such a wide divergence between the testimony of plaintiff and his witnesses and that of the defendants and their experts that obviously both, either consciously or unconsciously, are attempting to confuse the court. Plaintiff puts a value of $50,000 on Tea Caddy and $8,000 on Blue Grass Belle. Defendants' experts assert that the value of Tea Caddy is from $2,000 to $3,000, and that Blue Grass Belle is reasonably worth from $750 to $1,500. Defendant Chinn testified that Tea Caddy is worth from $4,000 to $6,000, and that Blue Grass Belle is worth $1,500. Manifestly this difference in the figures demonstrates that plaintiff has purposely magnified his damages and by the same token the defendants have made them ridiculously trifling.

The stallion Tea Caddy is of royal blood. He was sired by Rock Sand out of Tea's Over. Rock Sand was the issue of Sainfoin and Roquebrune. Tea's Over, sired by Hanover, is regarded as one of the very best brood mares in the American Stud Book. In England Hanover blood is considered pre-eminent and is one of the few breeds admitted in the English Stud Book. To a large extent the value of a stallion depends upon his breeding. While neither a man nor a horse should be judged solely on the achievements of his progenitors, but rather on the record of his own deeds, yet it may reasonably be expected that each will run true to form.

It is unfortunately only too true that history has many notable exceptions, but yet we know that birth and breeding are most important factors in the careers of man and beast. While we are fond of uttering platitudes to the contrary, it is self-evident that men are not born equal in body, mind or ambition. The same rule applies in the animal kingdom. In the last analysis blood will tell.

Tea Caddy has an enviable record and distinguished himself as a race horse. It would serve no useful purpose to analyze in detail the testimony as to the worth of the stallion and the mare. There are instances in the record which, in my judgment, point the way to a correct solution. In October, 1924, Tranter, a witness for defendants, was negotiating for the sale of the horse to an English syndicate at the sum of $20,000. It is true that in March, 1926, plaintiff indicated a willingness to sell this stallion for $10,000. That offer, however, was made when plaintiff was struggling under financial burdens and in order to raise money quickly it was imperative that he should make some sacrifice. On April 28, 1926, defendant Chinn by letter advised plaintiff that he had an opportunity to dispose of Tea Caddy for $16,000 or $16,500. Plaintiff declined that offer. While the references which I have made are not absolute proof of valuation, yet in this peculiar situation in which the court is placed, they furnish some guide in making a determination of this novel question. The earnings of Tea Caddy in the stud are extremely important in measuring his worth. I am convinced that when converted by the defendants, Tea Caddy was reasonably and fairly worth the sum of $25,000. The discrepancy in the figures as to the value of the mare Blue Grass Belle, while not so great as in the case of Tea Caddy, presents a situation where the court is put in a position where it must accept the figures of one side or the other, or, in the alternative, enter the realm of speculation. The latter course is preferable here. I believe that a valuation of $3,000 on Blue Grass Belle will not work injustice to either party.

Finally, the learned counsel for defendants, in his splendid brief, also urges that even if a demand were made the defendants were not bound to comply with it because they had a lien on the animals for their care. The answer to that argument is that no such issue was presented by the pleadings nor litigated on the trial. The defendants are now too late to avail themselves of that contention. Then, too, it might very well be said that the earnings which the defendants received from Tea Caddy and the foal which came to them from Blue Grass Belle largely exceeded the cost of their keep.

Judgment is hereby directed for plaintiff against defendants in the sum of $28,000 and costs.